IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

WILLIAM T. WULIGER,

                      Plaintiff,                    Case No. 3:05 CV 108

    -vs-

                                                  <u>AMENDED</u>
OFFICE OF THE COMPTROLLER        <u>MEMORANDUM OPINION</u>
OF CURRENCY, et al.,

                      Defendant.

KATZ, J.

## BACKGROUND

This case is one of many cases in the satellite litigation generated from the *Liberte Capital v. Capwill,* 5:99 CV 0818 (N.D. Ohio) debacle. Without belaboring the already familiar history of this litigation[1], a brief overview of the facts underlying this case is sufficient for purposes of this discussion. James A. Capwill ("Capwill") was the escrow agent who, along with his company Viatical Escrow Services ("VES"), handled the investment funds for several investor groups. These investment funds were used to fund various bank and brokerage accounts, ultimately to the detriment of the investors.

---

[1] For a case chronology, *see Liberte Capital Group v. Capwill,* 299 F.Supp.2d 799, 800-801 (N.D. Ohio 2002).

Following his appointment as Receiver, the Plaintiff has initiated suits against various brokerage firms and financial institutions. In actions against the financial institutions, the Receiver sought discovery of Suspicious Activity Reports ("SARs") and the banks therein raised strenuous objections thereto.

In January 2005, William T. Wuliger ("Wuliger") as acting General Receiver, brought this action against the Office of the Comptroller of Currency, Julie L. Williams, Acting Comptroller, Douglas W. Roeder, Senior Deputy Comptroller (hereinafter collectively referred to as the "OCC"), KeyBank National Association, Liberty Bank, N.A., and Star Bank, N.A. ("the Banks"). In his complaint, the Receiver seeks declaratory and injunctive relief concerning the OCC's authority regarding the Receiver's access to non-public OCC information following the Plaintiff's unsuccessful administrative request. A determination on the Receiver's ability to access this information via the OCC is critical to the bank litigation previously referenced.

Pending before the Court are the: (1) OCC's motion to dismiss or, in the alternative, motion for summary judgment; (2) Plaintiff's cross-motion for summary judgment; (3) the Defendant Banks' cross-motion for summary judgment; and (4) a further statement of interest of the United States, presented by the Department of Justice. Also before the Court are the parties' responses to the various motions/statements. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. With the matters having been fully briefed, the Court now turns to the issues presented.

### STANDARD OF REVIEW

*A. Summary Judgment*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any

2

material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2541, 91 L. Ed. 2d 202 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact."

*Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

*B. Administrative Procedure Act*

Judicial review of an agency decision is authorized under the Federal Administrative Procedure Act ("APA"). 5 U.S.C. § 706. Under this statute the court, after review of the relevant legal questions and, where necessary, shall–

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and
**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be–
   **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
   **(B)** contrary to constitutional right, power, privilege, or immunity;
   **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

>> **(D)** without observance of procedure required by law;
>> **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>> **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

As the noted recently by the Sixth Circuit, the standard of review is narrow and deferential as "the court is not empowered to substitute its judgment for that of the agency." *Northeast Ohio Regional Sewer District v. United States EPA,* 411 F.3d 726, 733-732 (6th Cir. 2005), citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971). Moreover, the burden of proof is on the aggrieved party seeking to establish the invalidity of the administrative action. *Warren v. U.S.,* 932 F.2d 582, 586 (6th Cir. 1991); *Cape Hatteras Access Preservation Alliance v. U.S. Dept. Of Interior,* 344 F.Supp.2d 108, 119 (D.C.C. 2004); *Carabell v. United States Army Corps of Engineers,* 257 F.Supp.2d 917, 926 (E.D. Mich. 2003), *aff'd* 391 F.3d 704 (6th Cir. 2004); *Burkholder v. Wykle,* 268 F.Supp.2d 835, 841 (N.D. Ohio 2002), *aff'd* 58 Fed. Appx. 94 (6th Cir. 2003). Where the agency determination cannot be sustained, the court must remand for further consideration of the request. *See Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

A review under the APA contemplates consideration of the administrative record in existence as opposed to a new record being made before the reviewing court. *Buckeye Forest Council v. U.S.*

5

*Forest Service,* __F.Supp.2d__, 2005 WL 1705084 *6 (S.D. Ohio July 20, 2005), citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743-44 (1985).

In this case, the OCC has moved for disposition under Fed. R. Civ. P. 12(b)(6) and 56. The Receiver has filed a cross-motion for summary judgment as have the Defendant Banks. However, given the nature of this administrative review and the fact that the Receiver has not sought discovery necessary to respond to the Defendants' motions, the appropriate vehicle for disposition is under Rule 56.

## LAW AND ANALYSIS

*A. Suspicious Activity Reports*

The Bank Secrecy Act of 1970 ("BSA") requires financial institutions to maintain records and provide reports to regulators which, in turn, assist in the investigation of criminal, tax or regulatory proceedings. An underlying purpose of the BSA was to counter money-laundering activities. To that end, the Secretary of the Treasury is authorized to issue regulations in promoting this record-keeping mandate as well as assisting in law enforcement or regulatory investigations. 12 U.S.C. § 153. Under the 1992 Annunzio-Wylie Anti-Money Laundering Act, "[t]he Secretary may require any financial institution . . . to report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). The anti-money laundering laws were most recently expanded by the USA Patriot Act of 2001[2]. Under the BSA, financial institutions are subject to civil and criminal penalties for violations of the record-keeping requirements.

---

[2] Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism ("USA Patriot Act"), Pub. L. 107-56, § 505, 115 Stat. 272 (Oct. 26, 2001).

The Treasury Department enacted regulations requiring financial institutions to file Suspicious Activity Reports ("SARs"). 31 C.F.R. § 103.18. Each of the respective banking agencies then promulgated regulations to comply with the BSA and SARs reporting requirement. *See*, 12 C.F.R. § 208.62 (Federal Reserve Board); 12 C.F.R. § 12.11 (OCC); and 12 C.F.R. § 563.180 (Office of Thrift Supervision).

The BSA prohibits notification of a suspicious transaction report to "any person involved in the transaction that has been reported," nor may an "officer or employee of the Federal Government . . who has any knowledge that such report was made may disclose to any person involved in the transaction that the transaction has been reported. . ." 31 U.S.C. § 5318(g)(2).

Confidentiality of SARs is addressed in OCC regulations as follows:

> SARs are confidential. Any national bank or person subpoenaed or otherwise requested to disclose a SAR or the information contained in a SAR shall decline to produce the SAR or to provide any information that would disclose that a SAR has been prepared or filed, citing this section, applicable law (e.g., 31 U.S.C. § 5318(g)), or both, and shall notify the OCC.

12 C.F.R. § 12.11(k). The regulations of the Federal Reserve Board[3] and the Office of Thrift Supervision[4] are essentially identical.

The procedure for requesting non-public OCC documents is set forth at 12 C.F.R. § 4.33. Consideration of a request for non-public OCC information and a denial thereto is contained at 12

---

[3] 12 C.F.R. § 208.62(j).

[4] 12 C.F.R. § 563.180(d)(12).

7

C.F.R. § 4.35. Finally, the regulation addresses the OCC's discretion and holds such a determination to be a final agency decision. § 4.35(a)(1).

*B. Undisputed Facts*

It is undisputed that on August 9, 2004, the Plaintiff sent letters to the OCC regarding the release of non-public information contained in those SARs which related to compliance by the Banks. Specifically, the Receiver requested "information contained in the SARs, all supporting documentation, and all related correspondence, memos or other documents, from January 1, 1998 through December 31, 2000" regarding numerous accounts. (Compl., Ex. 5.)

On December 21, 2004, Defendant Roeder, on behalf of the OCC, denied the Receiver's request.

*C. Analysis*

1. Review of OCC Decision

Validity of the OCC's regulations prohibiting disclosure of a SAR requires an analysis under the Supreme Court's opinion in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Where "Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782 (footnotes omitted).

As noted in *Chevron*, "[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap

8

left, implicitly or explicitly, by Congress." *Id.*, quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974). Where "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." In those cases where "the legislative delegation to an agency on a particular question is implicit rather than explicit. . . a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844, 104 S.Ct. at 2782.

Under the 1992 Annunzio-Wylie Anti-Money Laundering Act, Congress authorized the Secretary of the Treasury to:

> require a class of domestic financial institutions or nonfinancial trades or businesses to maintain appropriate procedures to ensure compliance with this subchapter and regulations prescribed under this subchapter or to guard against money laundering.

31 U.S.C. § 5318(a)(2). Equally clear was Congress's intent on keeping the reporting of suspicious transactions from being disclosed, with certain limited exceptions. § 5318(g)(2)(A) and (B). The importance of confidentiality, necessary to combat money-laundering activities, is further reflected in the safe harbor provisions of the Act. § 5318(g)(3).

It is clear that Congress was concerned that the reporting of suspicious transactions be confidential. While it did not address the disclosure of this information to third-parties, under *Chevron* the delegation to the agency on this issue is considered to be implicit and prompts a reasonable interpretation standard on behalf of the agency.

This situation differs from the circumstances presented to the Sixth Circuit in *In re Bankers Trust Company*, 61 F.3d 465 (6th Cir. 1995), the primary case relied upon by the Plaintiff. The subject of the dispute there involved documents prepared by the non-party Federal Reserve and the defendant bank in

9

the course of a bank examination and sought by the plaintiff company in a securities lawsuit. While the regulations involved in *Bankers Trust* differ from the case at bar, the Sixth Circuit's guidance on analysis is a starting point: "As long as the federal agency's regulation is based upon a permissible construction of the enabling statute, the regulation should be enforced." 61 F.3d at 469-470 citing *Chevron, supra*.

In this instance, it is not merely the enabling statute which must be considered but the authorizing substantive regulation under the BSA. As noted above, the statute, 31 U.S.C. § 5318, is entitled, "Compliance, exemptions and summons authority," and sets forth the general powers of the Secretary of the Treasury. The statute also addresses reportable transactions and prohibited notifications as follows:

> **(g) Reporting of suspicious transactions–**
>
> **(1) In general–** The Secretary may require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation.
>
> **(2) Notification prohibited–**
> **(A) In general–** If a financial institution or any director, officer, employee, or agent of any financial institution, voluntarily or pursuant to this section or any other authority, reports a suspicious transaction to a government agency–
> **(I)** the financial institution, director, officer employee, or agent *may not* notify any person involved in the transaction that the transaction has been reported; and
> **(ii)** no officer or employee of the Federal Government or of any State, local, tribal, or territorial government within the United States, who has any knowledge that such report was made may disclose to any person involved in the transaction that the transaction has been reported, other than as necessary to fulfill the official duties of such officer or employee.

§ 5318(g)(1) and (2). (Emphasis added.)

The statute also addresses exemptions in certain employment references. § 5318(g)(B)[5]. Additionally, there is a safe harbor provision which protects SAR filers from civil liability. § 5318(g)(3). It is this specific language within the statute upon which the Secretary derives his/her authority and the OCC, as a bureau of the Department of Treasury, is subject to direction therein.

The confidentiality provisions under the regulations have been upheld as consistent with the statutory authority approved by Congress. In *Weil v. Long Island Saving Bank,* 195 F.Supp.2d 383 (E.D.N.Y. 2001), the district court prohibited disclosure of the SARs in a class action initiated by borrowers who alleged an illegal kickback scheme involving the bank, the bank's CEO and a law firm. There, the court found the enabling legislation as sufficiently specific to satisfy the Sixth Circuit's test in *Banker's Trust*. *Id.* at 388. Despite the fact that one of the principals (of the defendant law firm) had been prosecuted, in denying that part of the motion to compel, the court succinctly noted, "the plain language of the regulation requires this court to deny the production of the SAR itself." *Id.* at 390.

---

[5]

   **(I) Rule of construction**– Notwithstanding the application of subparagraph (A) in any other context, subparagraph (A) shall not be construed as prohibiting any financial institution, or any director, officer, employee, or agent of such institution, from including information that was included in a report to which subparagraph (A) applies–
   **(I)** in a written employment reference that is provided in accordance with section 18(w) of the Federal Deposit Insurance Act in response to a request from another financial institution; or **(II)** in a written termination notice or employment reference that is provided in accordance with the rules of a self-regulatory organization registered with the Securities and Exchange Commission or the Commodity Futures Trading Commission, except that such written reference or notice may not disclose that such information was also included in any such report, or that such report was made.
   **(ii) Information not required**– Clause (i) shall not be construed, by itself, to create any affirmative duty to include any information described in clause (i) in any employment reference or termination notice referred to in clause (i).

A similar conclusion was reached by the district court in *Cotton v. PrivateBank and Trust Co.,* 235 F.Supp.2d 809 (N.D. Ill. 2002). There, the bank/trustee moved to compel production of a SAR upon the depository of a trust account. The court prohibited disclosure of the SAR after examining the statute and regulations and agreed that 12 C.F.R. § 21.11(k) was " valid and consistent with U.S.C. § 5318(g)(2)." *Id.* at 815. (Citations omitted.) While the court found business records made in the ordinary course of business to be subject to discovery, it prohibited disclosure of drafts of SARs or communications related to SARs. *Id.*

The state courts considering this issue have also found a SAR privilege to exist based upon the treatment by the above federal courts. *See Union Bank of California, N.A. v. Superior Court*, 130 Cal. App.4th 378, 29 Cal. Rptr.3d 894 (June 17, 2005); *International Bank of Miami v. Shinkitzky*, 849 So.2d 1188 (Fla. Ct. App. 2003).

Additionally, those federal courts considering the safe harbor provisions have also been steadfast in holding a SAR to be prohibited from discovery. *See Whitney National Bank v. Karam,* 306 F.Supp.2d 678 (S.D. Tex. 2004); *Lee v. Bankers Trust Co.,* 166 F.3d 540 (2d Cir. 1999); *Gregory v. Bank One,* 200 F.Supp.2d 1000 (S.D. Ind. 2002).

In the OCC's description of the rule and comments (preceding enactment of the regulation), confidentiality of the SARs is discussed as follows:

> The proposal preserved the confidential nature of criminal referral reports by stating that a SAR and the information contained in a SAR are confidential.
>
> One commenter correctly noted that the proposed regulation is unclear as to whether the confidential treatment applies only to the information contained on the SAR itself or also extends to the "supporting" documentation. The OCC takes the position that only the SAR and the information on the SAR are confidential under 31 U.S.C. 5318(g).

12

> However, as stated below in the discussion of new § 21.11(1), the safe harbor provisions of 31 U.S.C. 5318(g) for disclosure of information to law enforcement agencies apply to both SARs and the supporting documentation.
>
> Several commenters urged the OCC to adopt regulations that would make SARs undiscoverable in civil litigation, in order to avoid situations in which a financial institution could be ordered by a court to produce a SAR in civil litigation and could be confronted with the prospect of having to choose between being found in contempt or violating the OCC's rules. In the opinion of the OCC, 31 U.S.C. 5318(g) precludes the disclosure of SARs in discovery. However, the final rule requires a bank that receives a subpoena or other request for a SAR to notify the OCC so that the OCC may intervene in litigation if appropriate.
>
> This notification requirement is consistent with the approach the OCC has recently taken in the final revisions to part 4 of its regulations. In part 4, the OCC requires that a person or entity served in civil litigation with a subpoena to provide non-public OCC information notify the OCC so that the OCC can determine whether it should intervene in the proceedings.

Minimum Security Devices and Procedures, Reports of Suspicious Activities, and BSA Compliance Program, 61 Fed. Reg. 4332, 4336 (Feb. 5, 1996) (footnote omitted).

In viewing the statute and administrative regulations, the prohibition on disclosure of SARs was not undertaken lightly, either by Congress or the OCC. In fact, the OCC's policy emphasizing the confidentiality of non-public information is further evidenced in the regulations imposing criminal penalties for improper disclosure. *See* 12 C.F.R. § 4.37(b)(1)(ii)[6].

A court's review of an agency's determination must be considered in light of the Supreme Court's guidance:

---

[6] Any person who discloses or uses non-public OCC information except as expressly permitted by the Comptroller of the Currency or as ordered by a Federal court, under paragraph (b)(1)(I) of this section, may be subject to the penalties provided in 18 U.S.C. 641.

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

In this instance, the OCC responded to the request in a three page letter accompanied by two supporting interagency advisories. In its decision, the OCC began by reiterating the public policy against disclosure of a SAR, noting its confidentiality as reflected in the statutes. The decision then touched on the regulations addressing the confidentiality of a SAR and the court decisions upholding this stance. Based upon the statutory, regulatory and case law, the OCC denied Plaintiff's request for the SARs. The OCC also addressed the Receiver's alternate request for supporting documentation related to the SARs and other information kept in the ordinary course of business, noting that the OCC did not have the information described and that such a request should be directed to the Banks.

Having reviewed the statute, the regulatory process and case law on this issue, as well as the OCC's decision, the Court cannot find that the OCC's determination rises to an arbitrary or capricious level. Stated differently, this Court finds § 21.11(k) to be consistent with the authorizing legislation under 31 U.S.C. § 5318(g)(2) and a reasonable implementation of the statutory provision regarding reporting and disclosure of SARs.

2. Separation of Powers

The Plaintiff further argues that § 5318 violates the separation of powers as "the statute and/or regulation impermissibly invade[s] the province of the judiciary and [is] unconstitutional." (Doc. No. 36 at p. 26.)  This Court does not find Plaintiff's position to be well taken.

It is clear that Congress, under the BSA, delegated broad powers to the Secretary to implement regulations regarding maintenance of records and reports (by financial institutions) which would be useful in investigating money laundering activities.  Having determined that Congress authorized the Secretary of the Treasury to ensure reporting of suspicious transactions under § 5318, the OCC's regulations are a proper exercise of that statutory delegation.  As noted in the regulations, a purpose of the OCC's administrative procedure is to:

> Afford an orderly mechanism for the OCC to process expeditiously requests for non-public OCC information; to address the release of non-public OCC information without a request; and when appropriate, for the OCC to assert evidentiary privileges in litigation;

12 C.F.R. § 4.31(a)(1).  The regulations aimed at the confidentiality provisions, enacted in February 1996, reflect concerns regarding confidentiality as follows:

> The proposal preserved the confidential nature of criminal referral reports by stating that a SAR and the information contained in a SAR are confidential.

61 Fed. Reg. 4336.  Subject to the delegation of authority of Congress under the 1992 Annuzio-Wylie Anti-Money Laundering Act, the agencies' ultimate adoption of this provision was an appropriate exercise of their administrative authority.  Moreover, the regulations and comments preceding their enactment reflect the OCC's stance that "only the SAR and the information on the SAR are confidential under 31 U.S.C. 5318(g)." *Id.*

Under the APA, administrative determinations are subjected to judicial review and the regulations contemplate the agency's participation in the litigation process challenging disclosure of such non-public information. *See* 12 C.F.R. § 4.31(a)(1). Many courts reviewing these challenges have characterized the non-disclosure of a SAR as an evidentiary privilege. *Whitney National Bank v. Karam,* 306 F.Supp.2d at 682, citing *Gregory v. Bank One,* 200 F.Supp.2d at 1002. While challenges as to the production of a SAR have been largely unsuccessful[7], the courts confronting these discovery issues have found the records (of the financial institutions) kept in the ordinary course of business (and which may have given rise to creation of a SAR) are not exempt from discovery. *See Whitney National Bank v. Karam,* 306 F.Supp.2d at 682-683; *Cotton v. PrivateBank and Trust Co.,* 235 F.Supp.2d at 815; *Weil v. Long Island Bank,* 195 F.Supp.2d at 389 (agency regulation prohibiting disclosure did not conflict with the Federal Rules of Civil Procedure).

While disclosure of the SAR is prohibited, the court's ability to manage and direct discovery is not impinged upon as it still can direct production of those documents which might support the filing of a SAR. Additionally, there has been no showing that the BSA is unconstitutional and nor has any court held either 31 U.S.C. § 5318(g) or 12 C.F.R. 21.11(k) to constitute an improper separation of powers upon the judiciary. Because the court can direct production of financial records kept in the ordinary

---

[7] As noted by the DOJ, in its Statement of Interest, the court in *Cotton* noted the case of *Dupre v. Federal Bureau of Investigation,* 2002 WL 1042073 (E.D. La. 2002), wherein a portion of a SAR was ordered produced by the court. There the information was sought under the Freedom of Information Act and the court ordered only 2 pages of information contained in the SAR to be disclosed as the information contained therein did not fall under any of the FOIA's exceptions. *Id.* at *2. Thereafter, on appeal, the party seeking the information withdrew the request and the case was dismissed as moot.

16

course of business, and the regulation only pertains to the SAR itself, the Plaintiff's position on separation of powers is not compelling.

    3. Retroactivity

Finally, the Receiver's argument alleging a prohibited retroactive effect fails because § 5318(g)(2)(A)(ii) was amended prior to the present litigation, including the Receiver's separate actions against the Banks. In *Landgraf v. USI Film Products,* 511 U.S. 244, 280, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994), the Supreme Court reiterated the presumption against retroactivity and set forth the test for rebutting that presumption:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

Assuming *arguendo* that the movant meets the first two prongs of a *Landgraf* analysis, a court must also ascertain whether there is clear congressional intent which supports retroactivity. In this instance, the legislative history supports the OCC's position that those amendments applied to reports in existence at the time of the amendment[8]. In addition, the federal regulations at issue regarding

---

[8] *See* 12 U.S.C. § 1829b Historical and Statutory Notes; 31 U.S.C. § 5319(g)(2)(A) Historical and Statutory Notes (referencing Historical and Statutory Notes of 12 U.S.C. § 1829b), noting:

confidentiality of the reports were in effect as of 1996, well before the time frame pertinent to the case *sub judice*.

Therefore, as there is a clear legislative intent to support application of the statute to existing records, the Receiver's argument as to retroactivity is without merit.

## CONCLUSION

In sum, having reviewed the Plaintiff's administrative requests, and the OCC's decision in the context of the BSA and agency regulations, this Court does not find the administrative decision by the OCC to have violated 5 U.S.C. § 706. For these reasons, Defendants' motions for summary judgment (Doc. Nos. 25 and 42) are granted and the Plaintiff's motion for summary judgment (Doc. No. 36) is denied.

IT IS SO ORDERED.

    S/ *David A. Katz*
DAVID A. KATZ
SENIOR U. S. DISTRICT JUDGE